**United States District Court**
**Eastern District of Michigan**

United States of America

    Plaintiff,

vs.

Edward Dale,

    Defendant.

Case No. 92-cr-81127
Honorable David M. Lawson

_____

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**
_____

Edward Dale was convicted by a jury of three intentional killings related to drug trafficking as well as drug conspiracy and use of a firearm in furtherance of a drug trafficking crime. Dale was part of the "Best Friends" gang that distributed drugs and contracted murders, terrorizing Detroit in the late 1980s and 1990s. (Dale PSR ¶¶ 1-3, 5, attached as Exhibit 1, under seal). Dale's particular homicide victims were Al Foster, Michael Mitchell and Walter Daniels. (PSR ¶¶ 20-22). The "Best Friends" committed other murders as well.

Dale began serving a life sentence (four concurrent terms plus forty-five years' imprisonment and three years of supervised release) on April 16, 1996. *United States v. Polk,* 182 F.3d 919, *11, fn.1 (6th Cir. 1999) (unpublished); he was given jail credit from February 22, 1995 through his sentencing date in 1996. *See* Public

1

Information, attached as Exhibit 2. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Dale's arguments in support of release fall into four categories: his health and the risk of contracting Covid-19; a change in the law, specifically the applicability of *Booker;* and facts that existed when Dale was sentenced, such as his age as well as the sentences received by co-defendants who cooperated with the government in its prosecution. He also contends that his rehabilitation warrants release. Dale's arguments are not extraordinary and compelling. The Court should deny his motion.

Dale does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The government agrees that Dale's relevant medical condition, Diabetes Mellitus, Type II, increases the risk of severe complications from Covid-19. This is based on the CDC's confirmation of that risk, which could qualify as an "extraordinary and compelling reason" for release. However, Dale and the Bureau of Prisons have managed his diabetes well since 1996, and Dale has been vaccinated against Covid-19. Even if the Court finds that Dale's diabetes constitutes an extraordinary and compelling reason for release, the § 3553(a) factors—which the Court must also consider

2

under § 3582(c)(1)(A)—do not support release. Dale received four concurrent life sentences because he murdered three people in the course of participating in a continuing criminal enterprise that trafficked in cocaine and crack cocaine in several jurisdictions. His offense warranted the four life sentences he received. Dale was part of the "Best Friends" while on parole for a prior offense, so incarceration did not deter him from criminal activity, nor did supervision motivate him to comply with conditions that would have redirected his life. These § 3553(a) factors engulf any others.

The BOP has also taken significant steps to protect all inmates, including Dale, from Covid-19. Dale was administered the Pfizer-BioNTech vaccination for Covid-19 on February 3, 2021, receiving his second dose on February 24, 2021. *See* 2021 Medical Records, Exhibit 3, p. 130 (under seal). Offering the Covid-19 vaccine to BOP inmates is part of "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities, which has been ongoing since January of 2020. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Moreover, at Talladega FCI, as of September 13, 2021, 662 of 803 inmates at the FCI have been vaccinated as well as 133 staff. https://www.bop.gov/coronavirus/. Currently, there are no confirmed cases of Covid-19 among inmates at Talladega FCI. *Id.*

The BOP also continues to assess its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of September 13, 2021, this process has already resulted in the BOP releasing at least 31,372 inmates, 7,537 of whom are on home confinement presently. Especially given the BOPs' efforts— and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Dale's motion for compassionate release.

## Background

The "Best Friends" gang operated for over a decade distributing cocaine and crack cocaine in Detroit, eventually expanding to Ohio, Kentucky, Georgia, Pennsylvania, New York, Connecticut, Tennessee, North Carolina and Florida. (PSR ¶ 5). The "Best Friends" also committed contract murders and drive-by shootings to maintain control over their drug distribution territory, to threaten rivals and to retaliate for failure to pay drug debts. (PSR ¶ 6). Dale killed or caused the intentional killing of three people, (PSR ¶ ¶ 20-22) in addition to working as a drug distributor. (PSR ¶ ¶ 11, 16).

After a 32-day trial and about 70 witnesses, the jury convicted Dale, and three others, of intentional killing and/or aiding and abetting intentional killing in furtherance of a continuing criminal enterprise (21 U.S.C. § 848(e)(1)(A)) while

engaging in a drug trafficking conspiracy (21 U.S.C. § 846) and use or carrying of a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)). *See* Verdict Form, ECF No. 1242; *Polk,* 182 F. 3d at *1. The court sentenced Dale to four concurrent life sentences and an additional 45 years for the § 924(c) counts. *See* Judgment, ECF No. 1359; *Polk*, 182 F. 3d at *11, fn. 1.

But Dale has a prior criminal history as well. He was convicted of obstructing a police officer and resisting arrest at age 19 in Nebraska but failed to appear for sentencing. The court issued a bench warrant, but there is no documentation that Dale was ever sentenced for that crime. Two years later, he was charged with possession of a loaded firearm in association with stealing a vehicle. He received a custodial sentence for that offense. While he was on parole for that offense, he was participating in the Best Friends gang and subsequently arrested in this case. (PSR ¶ ¶ 66-69).

Dale began serving his prison sentence on April 16, 1996 and is currently incarcerated at Talladega FCI in Alabama. He is 52 years old, with no projected release date because he is serving four concurrent life sentences. His only underlying medical condition that places him at an increased risk to become severely ill from Covid-19 is Diabetes Mellitus, Type II; he has been vaccinated against Covid-19. Nevertheless, Dale has moved for compassionate release, citing his medical conditions, the Covid-19 pandemic, changes in the law, facts that

5

existed at sentencing and his rehabilitation as extraordinary and compelling reasons in support of relief. Dale has exhausted his administrative remedies with BOP, except his appeal of the Warden's denial of his request for release is pending and not due for decision until September 25, 2021. *See* Request to Warden, Exhibit 4; Warden's Denial, Exhibit 5; Administrative Record, Appeal Pending, Exhibit 6.

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates, instituting the administration of the vaccine at its facilities, and increasing home confinement.**

   A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

At the outset of the pandemic, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread

of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). When visitation is permitted at an institution, the visits are non-contact, require masks, and social distancing between inmates and visitors is enforced, either via the use of plexiglass (or similar barriers), or physical distancing (i.e., six feet apart). Visitors are screened for Covid-19 symptoms and their temperature is checked. Visitors who are sick or symptomatic are not allowed to visit, and inmates in quarantine or isolation cannot participate in social visiting. *See* [BOP Modified Operations](). But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month, and legal visits are accommodated upon request. *See* [BOP Modified Operations]().

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected

7

from Covid-19 and ensure that they receive any required medical care during these difficult times. It is clear from Dale's medical records that he receives medical treatment when necessary including daily monitoring of his diabetes. *See* 2021 Medical Records, Exhibit 3.

> **B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

8

The Bureau of Prisons' efforts on this point are not hypothetical. Currently, the Bureau of Prisons has 7,537 inmates on home confinement, and the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 31,372. [BOP Coronavirus FAQs](). As the Sixth Circuit stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United*

9

*States v. Patino*, 452 F.Supp.3d 705, 712 (E.D. Mich. 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

> C. **The Bureau of Prisons is receiving the Covid-19 vaccine and is in the process of administrating the vaccine in its facilities.**

As of September 13, 2021, the Bureau of Prisons has acquired 230,882 doses of the Covid-19 vaccine and is distributing it to staff and inmates. *See* [CDC Covid-19 Vaccine Tracker](#) and [BOP COVID-19 Vaccination Implementation.](#) The Bureau of Prisons has already vaccinated Dale, in February of 2021. *See* Medical Records 2021, under seal, attached as Exhibit 3, p. 130.

## II. The Court should deny Dale's motion for compassionate release.

Dale's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020). And as the Sixth Circuit has held, this statutory exhaustion requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A). The defendant's "generalized fears of contracting Covid-19, without more," do not satisfy this requirement. *United States v. Jackson*, 2020 U.S. App. LEXIS 32269, at *6 (6th Cir. Oct. 13, 2020); *accord United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020). Neither do changes in the law, such as *Booker's* non-retroactivity change in sentencing law, *United States v. Hunter,* --- F.4th ---, 2021 WL3855665, *5 (6th Cir. 2021), or non-retroactive statutory changes in the First Step Act of 2018. *Id.* at *9; *United States v. Jarvis,* 999 F.3d 442, 445-46 (6th Cir. 2021). Likewise, the Sixth Circuit recently held that "Section 3582(c)(1)(A) precludes a court from simply taking facts that existed at sentencing and repackaging them as 'extraordinary and compelling." *Hunter,* --- F.4th ---, WL

11

3855665, *9. Finally, "'[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.' 28 U.S.C. § 994(t)." *Id.,* *11.

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020). Those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction" when a defendant requests compassionate release. *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021).

### A. Aside from one risk factor that is diminished by his vaccine status, Dale has not shown "extraordinary and compelling reasons" for compassionate release.

Resolving the merits of a compassionate-release motion involves a "three-step inquiry": a district court must (1) "find that extraordinary and compelling reasons warrant a sentence reduction," (2) "ensure that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "consider all relevant sentencing factors listed in 18 U.S.C. § 3553(a)." *United*

12

*States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021); 18 U.S.C. § 3582(c)(1)(A). In *Elias*, the Sixth Circuit held that USSG § 1B1.13 is not an "applicable" policy statement for defendant-initiated motions for compassionate release. So the Court's analysis must focus on the first and third steps of the inquiry here. *Id*.

First, Dale's medical records establish that he has Diabetes Mellitus, Type II, which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). However, he has been vaccinated. Because BOP managed the risk of Dale's medical condition by providing him a Covid-19 vaccine, the risk he will become severely ill from Covid-19 has diminished, which also diminishes Dale's argument that he has satisfied the initial eligibility criteria for release under § 3582(c)(1)(A) based on this medical condition. But Dale cites several other reasons, none of which is extraordinary and compelling.

The Sixth Circuit recently analyzed and reversed a district court's granting of compassionate release to Ronald Hunter. Hunter is also serving a life sentence for his involvement in the murder of a 23-year-old woman who had allegedly stolen money from the leader of a drug enterprise. *Hunter,* --- F.4th ---, 2021 WL3855665 (6th Cir. Aug. 30, 2021). Like Dale, Hunter argued that had *Booker* been in effect when he was sentenced, he may not have received the same sentence because the guidelines, which had been mandatory, became advisory. Recent Sixth Circuit

13

cases *Hunter* and *Jarvis* foreclose this argument. *Jarvis*, which addressed non-retroactive changes in the First Step Act of 2018, held that such changes cannot be used to find extraordinary and compelling reasons for a sentence reduction under § 3582(c)(1)(A)(i). *Jarvis,* 999 F.3d 442, 445-46 (6th Cir. 2021). *Hunter* applies the same reasoning in the context of non-retroactive changes in sentencing law: "The non-retroactivity doctrine is an ordinary rule applied to all criminal defendants. Because of that rule, *Booker* is not retroactive, and nothing in § 3582(c)(1) suggests that Congress intended to displace that rule in the context of sentence reductions." *Hunter,* --- F.4th ---, 2021 WL 3855565, *5. Consequently, Dale's argument regarding *Booker* and conjecture that he may not have received a mandatory life sentence if *Booker* had been in effect is without support in law and is, instead, foreclosed.

Dale, like Hunter, also contends that some of the facts that were in existence at the time of sentencing - his age when he committed the crimes of conviction and his co-defendants' sentences - are somehow extraordinary and compelling now. This contention is likewise foreclosed by *Hunter*. Section 3582(c)(1)(A) does not allow a court to take facts that existed at sentencing and "repackage" them as extraordinary and compelling. *Hunter,* --- F.4th ---, WL 385565, *9. Such an approach cripples the general rule of finality and renders the "extraordinary-and-compelling-reasons requirement 'superfluous, void or insignificant.'" *Id.* (citations

14

omitted). Such an approach would make § 3582(c)(1)(A) an "unbounded resentencing statute." *Id.* at *10.

The *Hunter* court acknowledged the scientific articles relied on by the district court about how Hunter's age and drug and alcohol use may have made him unable to make rational decisions at the time he committed his crimes but concluded that "there will always be a new academic article a defendant can marshal to recharacterize their background and the facts of the offense," which again undercuts finality. *Id.* at *10. Moreover, Dale was an adult, not a juvenile offender when he began participating in the "Best Friends" enterprise.

Another set of facts that existed at Dales' sentencing was the sentencing results for his co-defendants. Dale compares his life sentence to four incomparable co-defendants, all of whom cooperated, claiming unjust disparities between his and their sentences. But as noted in *Hunter,* our criminal justice system is more commonly one of pleas than trials, and this can result in individuals who accept a plea bargain receiving a shorter sentence than someone who goes to trial. *Id.* at *11. "And that trade-off is permissible." *Id.* Even if there is a disparity between Dale and some co-defendants who cooperated, there is nothing extraordinary and compelling "about a disparity that results from a co-defendant's decision to plead guilty and assist the government." *Id.* But when comparing Dale with his co-defendants who proceeded to trial, there is not any disparity between him and two

15

of them who were also convicted of intentional killings in the course of the "Best Friends" enterprise. Gene Polk received four concurrent life terms plus 45 years' imprisonment, and John Gordon was sentenced to two concurrent life sentences. *Polk,* 182 F.3d at *11, fn 1. Different sentences exist for valid reasons, "such as differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government." *United States v. Conatser,* 512 F.3d 508, 522 (6th Cir. 2008) (relied on by *Hunter,* at *11.). Neither Dales' age when he committed the crimes nor a comparison between his sentence and those of his co-defendants is extraordinary and compelling. *Hunter,* at *11. These were facts in existence at the time of sentencing and so cannot be "repackaged" as extraordinary and compelling now. *Id.* at *9.

Finally, while the government does not dispute that Dale submitted letters in support of his rehabilitation and education efforts, nor does it dispute that Dale has not had a disciplinary incident for a long time, rehabilitation cannot stand alone to constitute an extraordinary and compelling reason in favor of release. 28 U.S.C. § 994(t); *Hunter,* at *11.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons," he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is

appropriate. 18 U.S.C. § 3582(c)(1)(A). A defendant's failure to establish that the § 3553(a) factors support relief is an independent basis for denying compassionate release. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020); *accord United States v. Austin*, 825 F. App'x 324, 325–27 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors); *United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (same).

This Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed to "remain[] an accurate assessment as to whether those factors justify a sentence reduction." *Sherwood*, 986 F.3d at 954. The defendant must therefore "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Id.* Dale has not made a compelling case. Here, even if the Court were to find that Dale established extraordinary and compelling reasons for his release, the § 3553(a) factors should still disqualify him.

For starters, Dale is serving a life sentence, which weighs heavily against release. The Sixth Circuit has repeatedly upheld the denial of compassionate release under § 3553(a) when a defendant has a long remaining sentence, including in a recent published decision. *Ruffin*, 978 F.3d at 1008; *accord Kincaid*, 802 F. App'x at 188–89; *Austin*, 825 F. App'x at 326; *see also United States v. Kincaid*, 805 F. App'x 394, 395–96 (6th Cir. 2020) ("[W]e don't think [the defendant]

17

raises a close question."). This is because the original sentence already reflects the district court's evaluation of "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law" under § 3553(a). *Kincaid*, 802 F. App'x at 188; *accord Ruffin*, 978 F.3d at 1008.

The plain language of the compassionate-release statute makes the point even more directly: it requires that the defendant's reasons for release "warrant such a reduction" in his sentence. 18 U.S.C. § 3582(c)(1)(A)(i). That inquiry depends, at least in part, on the length of time remaining on the defendant's sentence, requiring him to justify the magnitude of his requested sentence reduction. *Id.* So a defendant with many years left on his sentence, like Dale, must show that his reasons for release are so powerful that they "warrant" a "reduction" of that size. *Id.*

Dale, as a member of the "Best Friends" enterprise committed heinous crimes for which he received a just punishment. While relatively young, he was not a minor, and he had a criminal history and was even on parole when he committed the offenses of conviction. His three specific victims, not to mention the other victims of the larger enterprise, deserve to have Dale imprisoned for life. Dale's offenses were the most serious –intentional killing in support of an enterprise, namely a cocaine and crack cocaine conspiracy that spanned several states. Dale's continued incarceration is further justified by the need to promote respect for the law and provide just punishment. The community needs to know that killing

people while drug trafficking is taken seriously, not just for a few years or until some may forget the impact of the "Best Friends" in the Detroit area. The need to deter others, generally and specifically, is likewise important despite Dale brushing off why deterrence is significant. Dale contends that he is not a danger to the community and points to his behavior while incarcerated, but it is speculative as to how he may behave if released. The § 3553(a) factors do not support release.

### III. If the Court were to grant Dale's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Dale's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Dale's motion should be denied.

Respectfully submitted,

SAIMA S. MOHSIN
Acting United States Attorney

*s/Julie A. Beck*
JULIE A. BECK
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
julie.beck@usdoj.gov
313-226-9717

Dated: September 15, 2021

CERTIFICATION OF SERVICE

I hereby certify that on September 15, 2021, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will be served on all counsel of record.

                                                s/Julie A. Beck (P53291)
                                                Assistant United States Attorney
                                                211 W. Fort Street, Suite 2001
                                                Detroit, Michigan 48226
                                                Phone: (313) 226-9717
                                                E-mail: julie.beck@usdoj.gov