UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

  v.

Edward Dale,

      Defendant.

_____/

Case No. 92-cr-81127

Hon. David M. Lawson

**Sentencing Memorandum in Support of a Just Sentence**

Father Greg Boyle describes his birth and development as a series of winning multiple lotteries: the parent lottery, the neighborhood lottery, the education lottery, the mental health lottery, the love lottery. He was loved and cared for. He never had to carry what those that grew up without winning any of these lotteries carried. He was not within the ballpark of those that never had realistic choices for a healthy, promising future as children and young adults.

Father Boyle, a well-known Jesuit priest in Southern California that taught counsel about open wounds, processing pain, trauma, and what to do when an individual is born into circumstances easily labeled "a mess."[1] It is

---

[1]     *See, e.g.*, Gregory Boyle, *Tattoos of the Heart: The Power of Boundless Compassion* (2011); Gregory Boyle, *Barking to the Choir: The Power of*

1

about "stand[ing] with those whose dignity has been denied, . . . stand[ing] with those whose burdens are more than they can bear . . once in a while to be able to stand with the easily despised and the readily left out, with the demonized so that the demonizing will stop, and with the disposable, so the day will come when we stop throwing people away."[2]

In talking to Mr. Dale, his family, and learning about his history throughout these last few years, Mr. Dale won no lotteries. He never had a realistic opportunity to place himself within a parental structure or social net that built on what he did not have.

It is not lost on Mr. Dale that he is before this Court on a resentencing on various serious convictions from his actions spanning the mid1980s to early 1990s. He accepts responsibility for his acts that include murder, the pain he caused on the three victims and their families, his own family, and society. Mr. Dale seeks from this Court that it use its awesome power and discretion to resentence him to a custody term of years that is less than life. That it consider that which the original sentencing court could not and to understand his rehabilitation and future potential in the community.

---

*Radical Kinship* (2017).
[2]     Rev. Gregory J. Boyle, S.J.: 2017 Laetare Address, Notre Dame News, *available at* https://perma.cc/JH5C-UQLA.



Mr. Dale (middle) (age three)

### I. Mr. Dale's Fractured Childhood[3]

*Mr. Dale grew up without an intact family.* Mr. Dale, while born to the relationship of Gladys Pickett and Edward Rodgers, he had no father or father figure growing up. PSR ¶ 83. He heard rumors about his father while in the community, that he possibly lived in Battle Creek with another family, or that he might have been embarrassed because of his failings as a father to Mr. Dale, but there was no contact or support, ever.

Mr. Dale was raised by his mother Gladys Pickett and, really, the sheer force and fortitude of his slightly older sister Collette Echols. Mr. Dale moved as a child back and forth between Detroit and Omaha, Nebraska because his

---

[3] While Probation created a PSR for this case in 1996, large portions of the information of his childhood were not included. Additionally, because the sentencing court did not receive such information or heard it during sentencing, ECF No. 1569, PageID.6913-915, it is included for this Court's consideration.

3

maternal family lived there. His mother received a settlement after suffering an accident while employed at the Ford Motor Company in Detroit and moved to Omaha. Mr. Dale was the youngest child in the family and he along with Ms. Echols followed their mother.



Mr. Dale

*Mr. Dale suffered severe trauma during his development because of his mother's psychiatric health.* The move to Omaha did not result in stability or better opportunities for Mr. Dale because of his mother's health. Ms. Pickett's mental health severely deteriorated and Ms. Echols, as a fourteen-year old, committed Ms. Pickett for psychiatric treatment. Ms. Pickett was committed approximately four to five months. Mr. Dale was about eleven years old. Ms. Echols raised him on her own as she already done because of their mother's continuing psychiatric (and psychotic) decompensation.

Ms. Echols described that during that time, Mr. Dale was traumatized by seeing their mother's outbursts, including her breaking windows, starting fires (one that almost burned the house down), talking to herself, yelling, laughing, speaking in accents, and other acts.[4] Mr. Dale did not understand what she was going through and how she could no longer be entrusted as his caregiver. Ms. Echols tried to fill the large parental gap. She worked at age fifteen to ensure that there was food and some basics for Mr. Dale and her while in a home devoid of any parent.

During this first commitment, Ms. Pickett was found to suffer from paranoid schizophrenia or schizoaffective disorder with other mental health conditions. It was a difficult to fully diagnose her so she spent months while doctors diagnosed and found a medication regiment that would allow her to be back in the community. Ms. Pickett received electroconvulsive therapy and was on a range of medications in order to reduce further breakthrough symptoms. She was released and did well until she felt that medications were not needed thereby no longer receiving treatment. She then reverted to her

---

[4] Severe traumas such as neglect are linked to a "broad variety of negative life circumstances including poverty, juvenile delinquency, adult crime, low academic achievement, substance abuse, mental disorders and poor health." Brian Jacob & Joseph Ryan, *How Life Outside of a School Affects Student Performance in School*, 2 Evidence Speaks Reports (Brookings Mar. 22, 2018), *available at* https://perma.cc/2VSW-2F6Z.

previous mental health symptoms. At that point, Ms. Echols had her committed a second time.

While Ms. Echols continued raising Mr. Dale for a short period during this second commitment, it became too difficult for her to manage being a young parent herself, work, and caring for Mr. Dale. He was sent to Detroit to live with his sister Annetta Pickett.[5]

Upon Mr. Dale's mother's release from the hospital, she moved to Detroit. She lived with family until she further decompensated, and Ms. Echols took her back to Nebraska for a third commitment. She remained in Omaha after that.

*Mr. Dale lacked further structure in Detroit as a young teenager.* Mr. Dale's return to Detroit was marked by difficulties in his development. While he originally was supposed to live with his sister Annetta Pickett, he lived with his friend's mother. His own family was struggling with their own financial issues and the families they had created as much older siblings than him. Mr. Dale also could not complete school activities / assignments and was pushed out of the Detroit Public Schools never to return. PSR ¶ 89. Life

---

[5] Unstable housing is linked with a greater risk of poor health of children and their caregivers along with maternal depressive symptoms. Megan Sandel et al., *Unstable Housing and Caregiver and Child Health in Renter Families*, 141 Pediatrics 1, 6 (Feb. 2018).

became the Detroit streets for him. It was his only form of survival amidst instability and the eventual need to provide for his partners and children.

*Mr. Dale is introduced to the Best Friends.* In 1985, the last year Mr. Dale attended school, Carlos Culbert, a childhood friend, introduced him to Stacey Culbert that year. Stacey and Mr. Dale, then a fifteen-year old, developed a friendship. And Stacey, as a Best Friends associate along with other adults, took Mr. Dale in and he worked under their direction as a teenager by selling small amounts of drugs. Mr. Dale did this for survival when he felt that there was no support or way out of the deep poverty lacking a social net to help him in Detroit.

Mr. Dale met Samantha Culbert, Stacey's cousin, while working for Stacey. Mr. Dale and Ms. Culbert were in a relationship that led to the birth of his daughter Trenae Culbert. Mr. Dale has one other child, his son Torrey Lesure, born approximately when Mr. Dale was seventeen-years old.

Mr. Dale committed to sustaining financially his children. He shouldered the provider role. And that early burden-setting as a child when it was him and his slightly older sister Ms. Echols living alone with no parental figure, was in large part the wall that made it difficult for him as an adult to confront and address pain and trauma. That cut deep into him – that stunted healthy coping- and resiliency-skill development.

7

*Mr. Dale appearance in federal court.* Mr. Dale was an adult at the time he was made his initial appearance in federal court at 25 years old, but the conduct occurred when he was a developing juvenile and emerging adult. Mr. Dale's involvement with Best Friends started when he was fifteen years old and carried on for several years. His conduct spanned his youth into adulthood, and he is aware that many of the crimes for which he is convicted of occurred while an adult. It is still important to consider his youth, and the effect of other older men on his actions while he was still developing into maturity.[6]

## II.  Mr. Dale's Rehabilitation and Future Potential

*Mr. Dale's profound rehabilitation for several decades is sincere and recognized by over thirty staff members at the BOP.* To have several letters from BOP staff members discussing positive progress from a prisoner is an achievement; to have over thirty is exemplary, compelling, and demonstrative of the faith that many have in him, their views that he deserves an opportunity to be released in the community, and that he will do well in said community. Ex. A – Letters from BOP Staff. For example, he

---

[6]     S*ee* U.S.S.C., YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM, at 7 (2017), *available at* https://perma.cc/9RW7-ANLC (observing "most researchers reference 25 as the average age at which full development has taken place").

8

demonstrates abilities to assist staff in their needs and guide younger prisoners:

- "I've personally witnessed him mentoring younger inmates, encouraging them on obtaining their G.E.D., creating better study habits to better prepare for test, and also helping them with creative writing." *Id.* at 8.
- "I have observed Mr. Dale take on a leadership role with the younger incarcerated inmates to encourage them to participate in classes, recreation programs and other activities that are offered." *Id.* at 25.
- "Mr. Dale sets a great example for the younger inmates to follow in his person conduct, his educational pursuits, and in helping in the housing unit." *Id.* at 29.
- "[He] has been incarcerated for more than 20 years of his life and I believe within this time frame, he has changed his attitude for the better. Every time I encounter Mr. Dale, he is positive and always has a willingness to help. He has acknowledged his wrong doings and I believe that he is prepared to deal with the outside world." *Id.* at 10.
- "He is always trying to keep the peace and help staff however he can. He has helped diffuse situations he has witnessed between myself and other inmates. . . . I've even overheard him speaking with inmates one on one where he was trying to calm them down after they have been involved in a dispute with HSU staff. This goes far beyond his responsibilities and is hard to come by in the prison environment in which he lives." *Id.* at 1.
- "As the counselor over his living quarters, I have been in contact with his direct line supervisors many times reviewing his workmanship. Dale has been praised for the quality of his work and professionalism, as well as his willingness to help and adapt to a changing environment during the Covid-19 Pandemic." *Id.* at 5.
- "I've personally witnessed him mentoring younger inmates, encouraging them on obtaining their G.E.D., creating better study habits to better prepare for test, and also helping them with creative writing." *Id.* at 8.

Mr. Dale will positively contribute to the community upon release:

9

- "I have known Mr. Dale for the past 2-3 years and . . . would not be concerned what so ever to have Mr. Dale as a neighbor or as a co-worker in the future." *Id.* at 14.
- "As [a] Correctional Officer, I recommend any consideration that may be due to inmate Dale. He exemplifies a character of an individual who is rehabilitated and would be an asset to his family and community upon his release." *Id.* at 29.
- "After all I've witnessed of Mr. Dale's character and personality . . . I have no doubt that he will be able to function in society and be an outstanding citizen of this country." *Id.* at 1.
- "[He] has to the best of my knowledge not had any disciplinary issues while I have known him and appears to be ready to reenter society and be a positive impact on those around him." *Id.* at 3.
- "Based off my professional dealing with Mr. Dale I believe him to be rehabilitated for the better, and that he will thrive in society if given the opportunity do so." *Id.* at 8.
- "I believe that Edward Dale is ready to be released into society and become a positive role model and a batter father than he already is." *Id.* at 10.
- "[He] has shown growth in his behavior and continues to thieve to becoming a productive citizen. If given a chance for an early release he would be successful in his endeavors." *Id.* at 4.
- "Dale will make someone in the civilian world a productive and conscientious worker. In conclusion, I believe that Dale is setting a positive example for other inmates, and will make a productive citizen in the civilian world." *Id.* at 5.

Several of these letters were not part of the record when this Court denied Mr. Dale immediate release on his motion for compassionate release pursuant to 18 U.S.C. 3582(c)(1)(A)(i), however, the Court did recognize then that "[t]he evidence Dale has presented to the Court easily establishes that he is such a person. Witness the 20-some letters from BOP staff attesting to

10

his rehabilitation; extolling his mentorship, professionalism, positive outlook, and peaceful nature; and certifying his preparedness to work in and contribute to the civilian world." ECF No. 2514, PageId.20183. He submits that this strongly supports a resentencing to a term of years that provides him the possibility of release.

*Mr. Dale engages in extensive programming that assists in his rehabilitation.* Mr. Dale worked at the education library, a health services orderly, and currently is in a captain detail. Ex. C – 2022 Dale Program Review at 2 ("He has participated in appropriate programming that will aid him in obtaining gainful employment after release."). Even though he did not complete middle school, Mr. Dale obtained his GED while at the BOP in 1997. Ex. C at 3. He also completed hundreds of hours in coursework. Ex. C at 2-3, 6.

*Mr. Dale's future if he were to be released*: Multiple family members throughout the years have stated that they will provide Mr. Dale with housing and support if he were to be released. His desire is to live in Arizona with his sister Collette Echols. She, along with Hypoite Kayenda Muntu of Ramah Full Gospel Church, will provide employment while he obtains the necessary paperwork to enroll in a trucking school via the Arizona@Work Workforce Development Office. Ex. B – Letters from Community Members at 2. His goal

11

is to obtain a commercial driver's license in Arizona.

Mr. Dale also intends to work with Dennis Reed of DRII Productions on writing opportunities. Ex. B at 1. More importantly, a community goal is for him to work with young adults in Arizona through the church. He understands that the hurtful mistakes he made as a teenager and young adult could have been avoided with different adult guidance. He wants to show up for those that need someone but lack the structure that he developed.

### III. A Sentence Sufficient but Not Greater than Necessary

This Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment" of this case. *Gall v. United States*, 552 U.S. 38, 50 (2007).

*Mr. Dale's convictions are eligible for reduction:* Mr. Dale filed his motion for a reduced sentence pursuant to Section 404 of the First Step Act on May 9, 2019, and supplemental briefings on November 20, 2019, November 21, 2019, September 30, 2020, and March 21, 2022. ECF Nos. 2365, 2387, 2388, 2428, 2533. Over two years passed without *any* response by the government to Mr. Dale's original motion or his supplemental briefs.

During these years, the government had all opportunity to respond to the argument and case citations that the penalty provision under the Continuing Criminal Enterprise statute that Mr. Dale was convicted of, 21

12

U.S.C. § 848(e)(1)(A), are covered offenses that authorize this Court to impose a reduced sentence. ECF No. 2365, PageId.17465-740; ECF No. 2387, PageId.17671-673. And that any reduction is at the discretion of this Court. The government now disagrees on that point via their recently filed Sentence Modification Proceeding Memorandum. ECF No. 2568, PageId.20662-666. Mr. Dale submits that the government's arguments are waived for failing to address his properly filed motion and supplemental briefs.

Moreover, in other cases, the government in this district has conceded that courts do in fact have the authority under Section 404 "to reduce [a] sentence on [a] CCE conviction, even though it is not a 'covered offense,' if the district court concludes . . . they form a sentencing package." *United States v. Chambers* No. 21-1331, 2022 WL 612805, at *7 (6th Cir. Mar. 2, 2022) (Clay, J., dissenting) (citing Gov. Mot. for Remand at 2, *United States v. Smith*, Nos. 20-1833/21-1218 (6th Cir. Jan. 13, 2022) (order)) or the court may determine that the non-covered offense merited a sentence reduction. *United States v. Keith Walker*, No. 20-1555, ECF No. 29 at 2-3 (6th Cir. April 20, 2021) (remand order) ("the government now agrees that the district court is authorized to reduce [a] sentence on Count 1 (non-covered offense) and moves to remand" for a determination if the non-covered offense merited a sentence reduction).

13

*Courts have resentenced prisoners under the First Step Act for covered and non-covered offenses that include murder counts.* In *United States v. Reginald Marlin Ismel*, Ismel distributed drugs from 1989 to 1994 and was convicted of conspiracy to distribute cocaine base in violation of 21 U.S.C. §§ 846, 841(b)(1(A) and a second count involving murder in relation to a drug conspiracy, 21 U.S.C. § 848(e)(1)(A). 94-cr-00008, 2022 WL 1203823, *1 (W.D. VA, April 22, 2022). The court proceeded on the theory "that sentences are imposed as part of a package that cannot be unbundled." *Id*. at *2. Eventually, the court reduced Ismel's sentence from life to 360 months (time served on the drug count and 360 months on the murder.) *Id*. at *4.

In *United States v. Gregory Antonio Bates Felton*, Felton was convicted of three counts in 2004 of: conspiracy to distribute cocaine base, 21 U.S.C. §§ 846, 841(b)(1(A); possession of firearm in furtherance of a drug crime, 18 U.S.C. § 924(c); murder with use of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(j). 587 F.Supp. 3d 366, 367 (W.D. VA, Feb. 23, 2022). Because the guidelines were mandatory at sentencing, he received two life sentences plus 120 months consecutive.

Felton's conviction for § 841(b)(1(A) was calculated at an offense level of 43 based on the cross-reference to murder in U.S.S.C. § 2D1.1(d), 587

14

F.Supp. 3d 369, which is exactly what occurred in Mr. Dale's presentence report, PSR ¶¶ 28, 33. The § 924(c) count provided a mandatory minimum of ten years consecutive to any sentence, and § 924(j)(1) carried a maximum sentence of life, consecutive to any other sentence, thus it was an offense level of 43. 587 F.Supp. 3d 369. After finding that Felton was eligible for a reduction in sentence, the court resentenced him to a total 360 months: 40 months for the drug count, 120 consecutive months for the § 924(c), and 200 months consecutive on the murder. 587 F.Supp. 3d 374-75.

In the court's 18 U.S.C. ¶ 3553(a) analysis, it credited Felton's postconviction rehabilitation in prison, lack of disciplinary infractions, education courses and programming; his age at the time of the conduct; and the disparities of codefendants that received "substantially shorter sentences" because they benefited from substantial assistance motions and cooperation against their acolytes, including Felton: "The incongruity between Felton's sentence and that of his co-defendants only supports a conclusion which is drawn from other factors." 587 F.Supp. 3d 374. More so because Felton "received a significantly longer sentence than every one of his co-conspirators, including those who would have been subject to the murder cross-reference." 587 F.Supp. 3d 374.

15

*Criminal history category calculation and guidelines:* The parties received Probation's memorandum regarding this case. Undersigned counsel met with Mr. Dale to read and review the memorandum at Midland County Jail.

Mr. Dale agrees with the assessment that his criminal history category is I because: he would only receive one point for his conviction out of Omaha, Nebraska, listed in PSR ¶ 66; the conviction in PSR ¶ 68 is related to the conspiracy for which he was convicted in this federal case, thus he would no longer receive the three points for that conviction and the two additional points per U.S.S.C. § 4A1.1(d) for being on parole during the conduct in this federal case; as U.S.S.C. § 4A1.1(e) no longer applies, he would not receive an additional point for recidivism within two years of his release from the conviction listed in PSR ¶ 68.

In terms of the guideline calculations, counsel does not object to Probation's submission regarding Mr. Dale's guidelines being different if he were to be sentenced today. First, there is agreement that given that there was no specific drug amount determined by a jury, he would be eligible to be resentenced under 21 U.S.C. § 841(b)(1)(C) to a statutory range of 0 to 20 years for Count 1. Second, that for Counts 12, 13, and 15, the statutory range for intentional killing, aiding and abetting, it is 20 years to life with a base

16

offense level of 43. Third, that for Counts 16 and 18, those would now be 5 years for each count consecutive to any other sentences based on changes in the law.[7]

The guidelines are advisory in this case.

This Court has the power to extensively weigh the history and characteristic of Mr. Dale, the disparity of codefendants that committed many more murders than him but that the government worked with and are now free, his postconviction rehabilitation and conduct, and his current and future potential. All while still recognizing the tragedy of his involvement in his crimes to fashion a sentence that is less than life. Mr. Dale submits that a sentence of 432 months (36 years) is a fair and just sentence. It is not immediate release.

---

[7] While not a section 404 resentence proceeding, Judge Tarnow explained that "imposing an outdated interpretation of § 924(c) on a defendant would produce striking disparities. . . . [A defendant] would face a 25-year mandatory minimum on resentencing while someone sentenced by the Court the same week for the same conduct would face only a 5-year mandatory minimum." "A plain reading of Section 403(b) of the First Step Act is certainly susceptible to the interpretation that the benefits of the amendments to § 924(c)(1) should be restricted to those being sentenced for the first time after its enactment." But "[s]uch a reading would be dramatically out-of-step not only with the rest of the Act, but also with background principles of sentencing" and with what Congress "flatly rejected." *United States v. Raynard Versatile Crowe*, No. 11-20481, 2019 WL 7906591, *3-4 (E.D. Mich. Aug. 28, 2019), *appeal dismissed*, No. 21-1009, ECF No. 14 (6th Cir. May 18, 2021).

## IV. Mr. Dale's Placement Request

Mr. Dale requests a designation recommendation to FCI Milan in Michigan. Mr. Dale spent decades away from Michigan without receiving visits from most of his loved ones because of his placement locations. For example, the last time he saw his daughter was twelve years ago; his son twenty-seven years ago. Additionally, FCI Milan has a variety of UNICOR placements / employment opportunities available to prisoners, which is in line with his previous experience and commitment to work at other BOP facilities.[8]

## Conclusion

Mr. Dale understands the gravity of actions. He reflects daily on how to make amends to society and be a better person. Counsel here seeks from this Court "a compassion that can stand in awe of what the poor have to carry rather than stand in judgment at how they carry it."[9] Especially when Mr. Dale had no winning lottery tickets to his name and his involvement in the conspiracy began as a young teenager.

Counsel requests that this Court recognize and consider Mr. Dale's current and future potential, his extraordinary rehabilitation, and

---

8   BOP, *A Directory of Bureau of Prisons' National Programs* 7 (May 12, 2015).
9   Boyle, *Tattoos of the Heart* at 67.

commitment to himself and others by resentencing Mr. Dale to a custody term of 36 years. This is a term of custody that he will continue to serve while further taking programming in aid of his future adjustment in the community.

                Submitted,

Dated: November 24, 2022

s/ Fabián Rentería Franco
Counsel for Edward Dale
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
T: (313) 463-6143
E: Fabian_Renteria_Franco@fd.org

## Certificate of Service

Counsel certifies that on November 24, 2022, the following documents

- Sentencing Memorandum in Support of a Just Sentence
- Exhibits to the Sentencing Memorandum

were filed with the Clerk of the Court using the ECF system, which should send notification to opposing counsel.

                                                 s/ Fabián Rentería Franco
                                                 Fabián Rentería Franco